IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IMMERSION CORPORATION,

       Plaintiff,

   v.

SONY COMPUTER ENTERTAINMENT AMERICA, INC., and SONY COMPUTER ENTERTAINMENT, INC.,

       Defendants.

_____/

No. C 02-0710 CW

ORDER DENYING DEFENDANTS' MOTION FOR RELIEF FROM FINAL JUDGMENT

    Defendants Sony Computer Entertainment America, Inc., and Sony Computer Entertainment, Inc., (collectively, Sony) move, pursuant to Federal Rule of Civil Procedure 60(b), for relief from final judgment. Plaintiff Immersion Corporation (Immersion) opposes the motion.

    The matter was heard on January 20, 2006. Having considered all of the papers filed by the parties and oral argument on the motion, the Court denies Sony's request for relief from final judgment.

BACKGROUND

I.   Procedural History

    The general background of this patent case has been set forth at length in the Court's prior orders. See March 2, 2004 Order Resolving Parties' Motions for Summary Judgment (Summary Judgment Order); January 10, 2005 Order Denying Parties' Motions for Judgment as a Matter of Law and Addressing Other Matters (JMOL

United States District Court
For the Northern District of California

Order).  In brief, Immersion prevailed at trial on certain of its claims that Sony's Playstation consoles and Dualshock controllers, in conjunction with forty-four accused games, infringed U.S. Patent Nos. 6,275,213 ('213 patent) and 6,424,333 ('333 patent), owned by Immersion.  The jury found that the asserted claims of Immersion's patents were not invalid due to anticipation, obviousness or inadequate written description.  The jury awarded Immersion eighty-two million dollars as a reasonable royalty for Sony's infringement.  The Court later found in favor of Immersion on Sony's inequitable conduct defense and denied Sony's motions for judgment as a matter of law.  Sony has appealed the judgment against it.

In prosecuting its counterclaims and defenses, Sony asserted that the patents-in-suit were invalid as anticipated or rendered obvious by various prior art, including U.S. Patent Nos. 5,669,818 ('818 patent), 5,565,840 ('840 patent) and 5,684,722 ('722 patent), issued to Craig Thorner and others (collectively, the Thorner patents).  The '818 patent discloses a "seat-based tactile sensation generator capable of producing tactile sensation to a video game player corresponding to activity portrayed in a video game."  '818 patent, abstract.  The '818 patent incorporates by reference two previously filed applications that were issued as the '840 and '722 patents.  The '840 patent discloses a vest or harness for maintaining a flexible pad next to a video game player's body.  '840 patent, abstract.  The '722 patent discloses a device in which a control system converts the audio signal output by a video game program into a signal indicative of the amplitude, frequency, and

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  rate of change of the audio signal that is used to activate a

2  tactile sensation generator.  '722 patent, abstract.  In the seat-

3  based tactile sensation generator disclosed by the '818 patent,

4  actuators arranged within a foam seat cushion can be activated by

5  the host-dependent control system disclosed in the '840 patent

6  and/or by the host-independent control system disclosed in the '722

7  patent.  For a more detailed description of the Thorner patents,

8  <u>see</u> Summary Judgment Order at 6-8.

9      The Court found that, although the Thorner patents teach both

10  the individual activation of mass-moving actuators and varying the

11  frequency and amplitude of the vibrations, the Thorner patents did

12  not teach combining those two techniques to use the individual

13  activation of multiple actuators to create a complex tactile

14  sensation.  Summary Judgment Order at 8-9.  At trial, Sony

15  presented evidence and argument that the Thorner patents' host-

16  dependent and independent circuits could in fact be used in

17  combination to produce a complex tactile sensation.  Immersion's

18  expert Dr. Robert Howe testified, however, that the seat pad and

19  chest pad Thorner created to implement his patents involved

20  actuators separated by a distance and set in foam rubber, thus

21  ensuring that each actuator would generate only a "separate

22  localized sensation."  Trial Tr. 2964:23-24.  He opined,

> Thorner is talking about how do I convey sensations all over
> the body, the chest, the sides, the back, and so on.
> Immersion, on the other hand, says, let's create some
> interesting tactile sensation, some more complex, more varied,
> a broader range of sensations . . . .  Immersion patents are
> interested in . . . a sensation on a single point that covers
> a much broader range of possible sensations.

27  Trial Tr. 2965:8-19.  He stated that, with Thorner's seat pad, it

3

was "automatic" that a user would "feel [the actuators] throughout the seat pad in the same way." Id. 2967:23-24. Based on Dr. Howe's testimony, the Court found that a reasonable jury could have found that Thorner did not teach the element, disclosed in the '213 patent, of individual activation of mass-moving actuators to produce a complex tactile sensation resulting from varying the frequency and amplitude of the vibrations. May 17, 2005 Order Denying Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial and Granting Defendants' Motion for Stay (JMOL II Order) 8-9.

The Court also concluded that a reasonable jury could have found that the Thorner patents failed to teach the "decoupling" of amplitude and frequency limitation of the '213 patent claims; failed to teach enabling a "plurality of rotating-mass actuators to create in combination a vibration upon said user," an element of claim 14 of the '333 patent; and, also based on Dr. Howe's testimony regarding the spatial distribution of Thorner's actuators, failed to teach a limitation of claims 15 and 17 of the '333 patent, the activation of actuators with different frequencies "to create a tactile sensation upon the user that has a non-uniform amplitude over a duration of said tactile sensation." JMOL II Order at 8-12.

The Court further concluded that a reasonable jury could have found that the patents-in-suit were not rendered obvious by the Thorner patents in combination with personal massager inventions. Id. at 14-16. The Court found that Immersion had presented "substantial evidence of several secondary indicia of non-

4

obviousness," including the failure of Thorner and other video game

prior art to achieve commercial success.  Id. at 15-16.

II.  Allegations of Misconduct

Sony now accuses Immersion of conspiring with Mr. Thorner to

hide additional prior art, withholding prior art and other relevant

information in discovery, and then asserting at trial arguments

that would have been rebutted by the undisclosed information.

Immersion, in turn, accuses Sony of paying for Mr. Thorner's

perjurious testimony.

A.  Allegedly Withheld Public Use Prior Art

Any invention in public use in the United States more than one

year prior to November 30, 1995, the filing date of the parent

patent from which Immersion's patents-in-suit derive, is

potentially invalidating prior art.  See 35 U.S.C. § 102(b)

(setting forth prior use rule regarding patentability).  Mr.

Thorner now testifies that, more than one year prior to the filing

of the applications for Immersion's patents, he publicly used and

demonstrated prototypes of his patents, and that this public use

prior art fills the gaps identified by Dr. Howe between the Thorner

patents and the Immersion inventions.  Thorner Decl. ¶ 6.

As corroboration of Mr. Thorner's prior art demonstrations,

Sony proffers a prototype seat pad, vibrating actuators, controller

boxes and circuit boards.  See Kennedy Decl., Ex. 43 (photographs).

Immersion has inspected these prototypes and accessories, and does

not contest their authenticity.

Mr. Thorner's characterizations of his public use prior art

have been somewhat inconsistent.  In his initial declaration, Mr.

Thorner claimed that his hardware prototypes included a hand-held controller and an "eight-zone" vibrotactile system. Id. ¶ 9. In his rebuttal declaration, Mr. Thorner admitted that this statement was a "mistake," and that the 1994, first-generation prototype control box (created by co-inventor Thomas Glass) could control only four zones independently. Thorner Rebuttal Decl. ¶ 30. Also among the first generation prototypes, according to Mr. Thorner, was a seat pad with three vibrotactile "zones" that worked with his intelliVIBE system, a circuit board, and a "Sega Genesis game controller modified to vibrate using two independently controllable vibrating motors." Thorner Rebuttal Decl. ¶ 27. Mr. Thorner does not explain, however, if the motors within the modified controller vibrate independently of each other (in which case, according to the definition of "zone" Sony used at the hearing, there would be two zones in the controller), or independently of zones in the seat pad or other accessories. To the extent that the hand-held controller was used with the seat-pad and the first-generation intelliVIBE system, Mr. Thorner's rebuttal declaration suggests that the handheld controller contained only one zone. See Thorner Rebuttal Decl. ¶ 30 ("my original 1994 prototype control box . . . could only control four zones independently (such as three zones in the vibrotactile seat pad and one accessory zone)"). In his initial declaration, Mr. Thorner asserted that he "openly demonstrated working prototypes of my handheld video game controller." Thorner Decl. ¶ 6. Mr. Thorner subsequently revised his testimony; he now states only that the modified Sega Genesis controller "was shown and its functionality described and made

6

United States District Court

For the Northern District of California

clear."  Thorner Rebuttal Decl. ¶ 27.

According to Mr. Thorner's revised testimony, he and co-inventor Paul Heilman created a "second-generation prototype" in January, 1995 that used a microcontroller to control independently eight vibrotactile zones.  Thorner Rebuttal Decl. ¶ 31.  For this second-generation system, Mr. Thorner states that Mr. Heilman "created assembly control code, including microcontroller code for pulse width modulation that independently controlled vibration frequency and amplitude, to run the second generation prototype." Thorner Rebuttal Decl. ¶ 31.  Mr. Heilman describes the expanded intelliVIBE system as a "computer-controlled system with multiple independent motors that can be individually controlled in terms of their intensity," and "human perceived frequency."  Kennedy Decl., Ex. 11, Heilman Dep. 27:8-28:5.  However, Mr. Heilman also testified that pairs of motors within zones could not be controlled independently.  Heilman Dep. 152:2-4.

In his initial declaration, Mr. Thorner claimed that in September, 1994 he provided to other companies eight programs, including "Car.bas," that could create "a nearly infinite variety of tactile sensations."  Thorner Decl. ¶ 8.  The demonstration programs included instructions "that independently control . . . the on and off times of the voltage supplied to the motors and the rotational speeds so that the frequency and amplitude of the vibrations produced by the individual motors could be controlled separately to create the frequency and amplitude of the vibrations."  Id. ¶ 8.  In his rebuttal declaration, Mr. Thorner explained that he had been "confused," and that Car.bas and other

7

**United States District Court**

For the Northern District of California

programs were later, "substantially identical" versions written to adapt the original 1994 "Papyrus.bas" program, which worked with the first-generation Glass prototype, to use with the second-generation prototype based on the Heilman microcontroller.[1] Thorner Rebuttal Decl. ¶ 32.  Nevertheless, Mr. Thorner reiterates that even the first generation Papyrus.bas program allows commands to be sent with varying intensity and to one of the four vibrotactile "zones"

> in a vibrating seat pad (or another accessory such as my modified Sega Genesis controller with two independently controllable vibrotactile zones), where each zone has one or more vibrating eccentric mass motors, in order to create car effects (such as a car spinning out of control or turning) or helicopter effects (such as a helicopter flying, moving, crashing or shooting a machine gun), when they send instructions separately to each of multiple vibrotactile zones.

Thorner Rebuttal Decl. ¶ 35.  Mr. Thorner also claims that, using many rapid instructions to turn on or off a zone at a particular intensity level, a programmer could "easily decouple vibration frequency and intensity to create any desired complex, combined vibrotactile effect for a user."  Thorner Rebuttal Decl. ¶ 37.

Several witnesses generally corroborate Mr. Thorner's public use prior art, although none has any first-hand memory of his demonstration of a vibrating controller, the accessory potentially

---

[1]Immersion accuses Mr. Thorner of deliberately falsifying a 1996 program in order to pass it off as prior art from 1994.  Mr. Thorner claims that because the code in the earlier and later programs was "almost identical" and had "the same visual presentation and functionality," he became confused as he attempted to make the programs readable.  Id. ¶ 32.  Mr. Thorner asserts that he discovered this error on September 11, 2005, and voluntarily produced the genuine second-generation programs the next day.  Id. ¶ 32.

8

**United States District Court**

For the Northern District of California

most significant to Sony's invalidity case.  In September, 1994, Mr. Thorner traveled to Mesquite, Texas in order to demonstrate his inventions, including the first-generation version of intelliVIBE, for id Software, a computer company.  John Romero, an id Software co-founder, recalls that Mr. Thorner demonstrated a vest with "multiple vibrating sensor points at different areas within the vest," and that he brought along other prototypes including a hand-held controller and steering wheel, with similar vibrating sensors.  Romero Decl. ¶ 5.  At his deposition, however, Mr. Romero clarified that he had no recollection of Mr. Thorner demonstrating any prototype other than the seat pad.  Romero Dep. 22:18-21.  Mr. Romero personally tested the seat pad prototype for five or ten minutes, and described the motors as "all on independently.  One would turn on, it would turn off.  The next one would turn on.  It did it in a circular pattern."  Kennedy Decl., Romero Dep. 25:12-13, 49:15-17.  Mr. Romero testified that intelliVIBE operated as a system where the frequency of vibration of the motors was decoupled from the intensity of the vibrations, and that the system provided complex combined sensations.  Romero Dep. 50:3-9, 14, 50:25-51:5.  Mr. Thorner left printouts and a disk of sample programs with id Software.  Romero Decl. ¶ 8.  No one at id Software executed a confidentiality agreement with Mr. Thorner.  Id. at ¶ 9.

A similar demonstration was also given in September to Kyle Freeman and other representatives of NovaLogic in Tarzana, California.  Thorner Decl. ¶ 12.  In his declaration, Mr. Freeman recalls that the prototypes demonstrated included a seat cushion and vest, which were used with "test programs that independently

**United States District Court**

For the Northern District of California

created vibrations of varying intensity and time intervals to

create particular effects." Freeman Decl. ¶ 5.[2] At his

deposition, however, Mr. Freeman testified that Mr. Thorner showed

them the vest but "didn't actually operate that for us." Freeman

Dep. 30:19. Like Mr. Romero, Mr. Freeman recalls sitting on the

seat pad while it was operating for "around five minutes or less."

Freeman Dep. 32:6-9. He specifically recalls a program entitled

Heli.Bas, and attaches to his declaration a program that he says

appears to be substantially the same as the program disclosed in

1994 by Mr. Thorner. Freeman Decl., Ex. A, File: "Heli.Bas"

Printout of Quickbasic v4.5 Program Code. NovaLogic likewise did

not sign any confidentiality agreement with Mr. Thorner.

In March, 1995, Mr. Thorner again demonstrated his inventions,

this time to employees of Papyrus Software in Somerville,

Massachusetts. Thorner Decl. ¶ 13. Matteo Marsala of Papyrus

Software testified that a vibrating seat pad was demonstrated

before about a dozen people. Kennedy Decl., Ex. 10, Marsala Dep.

40:3-12. Mr. Marsala himself sat on the seat pad and felt its

vibrations. Marsala Dep. 35:23-36:5. He describes the sensation

as a cycling of the motors inside the pads, in which "the intensity

of the motors would change based on how fast the spin or how

---

[2]Sony's attorney's provided Mr. Freeman with a draft
declaration that included a statement that Mr. Thorner showed him a
prototype "vibrating hand-held controller." Heinrich Decl., Ex. Y.
According to email correspondence between Sony and Mr. Freeman, he
then edited the declaration to eliminate items that he didn't
clearly recall, noting, "I don't specifically recall any devices
other than the seat and the vest, but it was 11 years ago." Id.,
Ex. Z. During his deposition, however, Mr. Freeman denied that the
draft declaration had any references to prototypes that he was
unable to recall. Id., Ex. AA, Freeman Dep. 89:16-18.

United States District Court

For the Northern District of California

intense the spin was," giving him the feeling "like this thing is kind of cycling and rotating around you."  Marsala Dep. 30:10-23. Mr. Marsala stated that Mr. Thorner "had the black box with the seat pad," and recalls Mr. Thorner "talking" about other peripherals, including a chest pad and gloves, all of which "would be able to be plugged into his intelliVIBE system and each one of them would have independent control over their motors and be able to pass along a simulated effect from the game to all translate into one feeling."  Marsala Dep. 34:17-24.

Sony's attorneys now also represent Mr. Romero, Mr. Marsala and Mr. Freeman.  Thus, Immersion was prevented from asking them about the content of their preparation to give testimony.  E.g., Romero Dep. 8:2-7.  According to Mr. Romero, he is not in need of legal advice, yet he has been represented by Sony's attorneys ever since being contacted by Mr. Gewirtz.  Romero Dep. 6-7.  On June 22, 2005, Mr. Thorner emailed Mr. Freeman with a printout of a computer program and asked, "Perhaps you will remember this and be able to authenticate it as the original program you saw?"  Heinrich Decl., Ex. 6, June 22, 2005 Email from Craig Thorner to Kyle Freeman.  However, as Mr. Thorner now admits, the program he showed Mr. Freeman was not the original 1994 program, but a later version. At his deposition, Mr. Freeman testified that he had had no communication with Mr. Thorner about the program.  Freeman Dep. 88:22-24.

Sony expert Dr. Allan Gottlieb has reviewed documents of Mr. Thorner's entitled "Using intelliVIBE" as well as six QuickBasic 4.5 demonstration programs, Findval.Bas, Vibestep.Bas, Accel.Bas,

1  IVibe255.Bas, Car.Bas and Heli.Bas.  Based on this review, Dr.

2  Gottlieb opines that the intelliVIBE system contained "a number of

3  'tactile feedback zones,'" each driven by its own vibrating

4  actuator;[3] each of which could be programmed independently or

5  simultaneously; the intensity, frequency and duration of which

6  could be set to any value for any length of time.  Gottlieb Decl.

7  ¶ 6.  For instance, according to Dr. Gottlieb, the Heli.Bas program

8  produces "sensations in the selected zones [e.g. back, right leg,

9  left leg, chest pad, left hand and right hand] that can vary

10  independently in intensity, frequency, and duration."  Id. ¶ 10.

11  Dr. Gottlieb explained at his deposition, however, that individual

12  motors within a particular "device" operate uniformly:[4] "When you

13  issue a command, it is a device-specific and also device-wide

14  command, it pertains only to the device mentioned but pertains to

15  all of the device mentioned."  Heinrich Decl., Ex. DD, Gottleib

16  Dep. 143:5-14.

17      B.   Thorner's Pre-Trial Contacts with Immersion and Sony

18      On December 7, 1999, Immersion contacted Mr. Thorner to

19  propose that Immersion acquire the '840 patent, in exchange for

20  fifteen percent of any royalties derived from license agreements,

21  up to a cap of $1.5 million.  Thorner Decl., Ex. A, December 7,

22  1999 Letter to Craig Thorner from Richard H. Abramson, Director of

23

24      [3]Sony clarified at the hearing that each "zone" does not in
fact have its own actuator, but that there are two motors in each
25  zone.

26      [4]Here, Dr. Gottlieb's use of the terms "zone" and "device"
differs from Sony's description of those terms at the hearing;
27  Sony, unlike Dr. Gottlieb, defines each motor as its own "device."

28                                  12

United States District Court

For the Northern District of California

Litigation and Intellectual Property.  No agreement was ever finalized; Mr. Thorner later told Immersion that he considered the offer insufficient.  Chang Decl., Ex. A, March 18, 2003 Email from Craig Thorner to Dean Chang.

In late 2002, according to outside counsel Douglas E. Lumish of Weil, Gotshal & Manges, Sony also contacted Mr. Thorner.  Sony was interested in talking to Mr. Thorner "because he was the inventor on three patents of significant interest as prior art"; "[t]he purpose in contacting him was to see if he had any additional prior art, anything else that might be of interest to the case and any explanation in the description of the patents that was interesting to me."  Lumish Decl. ¶ 2; Kennedy Decl., Ex. 40, Lumish Dep. 26:9-13.

Mr. Thorner was initially receptive because he saw working with Sony as an opportunity to meet "important people at Sony who make the business decisions," in order to demonstrate his technology and "perhaps get it adopted in some manner."  Heinrich Decl., Ex. B, Thorner Dep. 83:10-11, 22-25.  Mr. Lumish spoke with Mr. Thorner two or three times, and set up a meeting in early April, 2003 in New Jersey.  Lumish Decl. ¶ 3.  In those conversations, Mr. Thorner "described what he had," and Mr. Lumish asked him "extensively about whether there was other types of prior art that might be of interest."  Lumish Dep. 65:1-4.  Mr. Lumish asked if there were any prototypes, and Mr. Thorner told him that he might have a seat pad in his garage or basement, "the same seat pad that was described in the patents."  Id. 26:18-24.  Mr. Thorner told Mr. Lumish about the mechanism for controlling the motors, and

13

**United States District Court**
For the Northern District of California

Mr. Lumish concluded that it was "essentially what was described in the patent." Id. 28:10-17. Mr. Lumish intended to engage Mr. Thorner as a consultant and to view the seat pad prototype. Id. 60:24-61:1. However, Mr. Thorner was not interested in the proposed April meeting with Sony attorney and executive Riley Russell, who did not fit Mr. Thorner's criteria for the desired important, business decision-makers. Thorner Dep. 88:8-17. Mr. Thorner says he told Mr. Lumish that he would have "the meeting first, then I can give you some, you know -- give you my relevant material." Id. 90:8-10.

Mr. Thorner cancelled the meeting shortly before it was scheduled, and Mr. Lumish's later attempts to reach him were unsuccessful. Lumish Decl. ¶ 4; Lumish Dep. 53:15. Mr. Lumish was left "with a very firm conclusion that what [Mr. Thorner] had was no different than or more detailed than or better than" the Thorner patents, and Mr. Thorner also "led [him] to believe that there had been no prior public use of the invention." Lumish Dep. 65:8-11, 60:7-9.

In March, 2003, as he was negotiating with Mr. Lumish, Mr. Thorner says, he contacted Immersion and advised it that he owned technology that was relevant to its lawsuit against Sony and Microsoft, and that he believed Sony and Microsoft would prevail if they learned about his prior art technology. Thorner Decl. ¶ 3. He claims to have had "numerous" telephone calls with Immersion attorney Patrick Reutens, and others associated with Immersion, between March and April 18, 2003. Thorner Decl. ¶ 3. He told Mr. Reutens, Victor Viegas, Immersion's CEO, and outside counsel

14

**United States District Court**

For the Northern District of California

Richard Birnholz of Irell & Manella about the "prior art controller and entire vibrotactile system with great specificity and advised Immersion that my handheld game controller was, in effect, the world's first 'DualShock' controller." <u>Id.</u> ¶ 4.  He further told Mr. Reutens of his "eight-zone" vibrotactile system, explaining that frequencies and amplitudes of the eight motors could be independently controlled.  <u>Id.</u> ¶ 5.  He advised Immersion of his open demonstrations in September, 1994.

Mr. Thorner declares that, as a result of these conversations, Immersion "understood that I was a very dangerous witness against them with regard to my public use prior art, patents and what I had invented . . . ."  Heinrich Decl., Thorner Dep. 270:23-25.  Mr. Thorner describes Immersion's response as follows,

> On several occasions, Immersion's attorneys including Patrick Reutens and Richard Birnholz stated that they heard enough about my prior art, and did not need or want to hear any more details about it.  I was advised by Immersion that they were looking for a valued partner, and Mr. Reutens told me that I 'would be well treated financially' if I entered into an agreement with Immersion.  Mr. Reutens and Mr. Birnholz made clear during our telephone discussions in the weeks that preceded entering agreements with Immersion, that I should not provide any of my prior art information to Sony and Microsoft.  They also explained that I should never send Immersion anything in writing so that there would be no record of my prior art.

Thorner Decl. ¶ 18.  At his deposition, Mr. Thorner amplified,

> They [Immersion representatives] said, 'Okay, we're done talking about your prior art, your public use prior art, your patents, your technology, we never want to hear about it again, you are never to disclose this to Microsoft and Sony, there's no doubt we're going to be strategic partners, theoretically speaking this will damage our case, your assessment that we will lose our case if this goes to the opposing counsel is correct, without admitting anything, of course.  So we're going to work a deal, what is it that you want?'

15

**United States District Court**
For the Northern District of California

1   Thorner Dep. 270:9-19.

2       Immersion's account of these conversations differs

3   dramatically.  According to Patrick Reutens, Immersion's General

4   Counsel, Mr. Thorner alleged that Immersion's TouchWare Gaming

5   software infringed his '722 patent, and threatened to file suit

6   immediately and seek an injunction.  Reutens Decl. ¶ 2.  This is

7   supported by a March 18, 2003 email from Mr. Thorner to Dean Chang,

8   Immersion's Chief Technology Officer and Vice President of Gaming,

9   copied to Mr. Reutens and others, in which Mr. Thorner warned,

10       It's urgent we communicate with regard to your impending
        release of your "TouchWare" software, which according to your
11       press release of March 6th 2003, is currently in beta testing.
        It is my belief that this software infringes on several of the
12       patents of mine and my company VRF Corp.  We call this
        technology "AudioSense®" and have patents issued and pending
13       in both the US and abroad.  For your reference, the parent
        case is US Pat. No. 5,684,722, having priority back to
14       September of 1994.
            It is my intention, in the immediate near future, in the
15       absense [sic] of good faith negotiations with your company, to
        seek an injunction on the basis of patent infringement and
16       irreparable harm to my company should you release your
        software.
17
    Chang Decl., Ex. A, March 18, 2003 Email from Craig Thorner to Dean
18
    Chang.  Mr. Thorner also reportedly told Immersion that he believed
19
    his patents would invalidate Immersion's U.S. Patent No. 5,857,956
20
    (the Moriyasu patent).  According to Mr. Birnholz, Mr. Thorner said
21
    that he had been offered a $300 hourly fee by Sony, but that this
22
    type of compensation was not what he was looking for, that he
23
    wanted "substantial consideration in terms of a business
24
    relationship."  Birnholz Dep. 23:22-24:1.  Mr. Birnholz says that
25
    Mr. Thorner told him that Mr. Thorner's "work was important to the
26
    case and that he thought Sony would likely win the case with his
27

28                                  16

help."  Birnholz Dep. 26:8-10.  Mr. Reutens and Mr. Birnholz deny

that they were ever on a call together with Mr. Thorner and deny

that Mr. Thorner told them about any alleged "public use" prior art

or other non-patent prior art.  Reutens Decl. ¶ 4; Heinrich Decl.,

Birnholz Dep. 80:7-81:12.  Victor Viegas denies ever speaking on

the phone with Mr. Thorner.  Heinrich Decl., Ex. L, Viegas Dep.

224:8-9.  Mr. Chang says that he spoke with Mr. Thorner once, but

that his business plans for his product seemed "unrealistic and

exaggerated," and thus Mr. Chang was not eager to talk further

about the product.  Chang Decl. ¶ 4.

On April 18, 2003, after these disputed conversations,

Immersion and Mr. Thorner entered into two separate agreements.  In

the first, Immersion assigned Mr. Thorner ownership of the Moriyasu

patent and Mr. Thorner granted Immersion a "perpetual, irrevocable,

worldwide license" to his '722 patent and any divisionals.  Thorner

Decl., Ex. K, Agreement ¶¶ 2, 3.  Immersion promised to fund fifty

percent of the costs of obtaining foreign counterparts of the '722

patent, and to pay Mr. Thorner fifty percent of gross revenues

derived from any Immersion licenses of the '722 patent and twenty

percent of net revenues from sale or licensing of Immersion's Audio

Analysis Software.  Id. ¶ 6-8.  As part of this agreement, Mr.

Thorner agreed not to "provide consulting to, or otherwise assist

in any way, any third party in connection with any lawsuit, dispute

or legal action between such third party and Immersion."  Id. ¶ 11.

In the second, Immersion engaged Mr. Thorner as an independent

contractor at a rate of $100.00 per hour.  Thorner Decl., Ex. K,

Independent Contractor Services Agreement.  This agreement included

United States District Court

For the Northern District of California

a conflict-of-interest provision in which Mr. Thorner agreed not to accept any work or obligation "inconsistent or incompatible" with his obligations under the Agreement.[5]  Id. ¶ 5.

On July 29, 2003, Mr. Thorner sent an email congratulating Immersion on the settlement of its claims against Microsoft and noting that he wouldn't be needed to testify on Immersion's behalf. Reutens Decl., Ex. A.  Mr. Thorner did not suggest that he was entitled to a share of Immersion's settlement; however, he did say that he had "a few questions about this development, specifically regarding the '722 case and the need (or lack thereof) to pursue internationally at this time."  Heinrich Decl., Ex. JJ.  Mr. Reutens responded on July 31, stating that Immersion might "need [Mr. Thorner's] assistance" in the ongoing lawsuit against Sony. Reutens Decl., Ex. A at 1.

Several months later, Immersion outside counsel Andrei Iancu and Alan Heinrich called Mr. Thorner seeking consulting services in connection with the lawsuit against Sony.  Heinrich Decl., Heinrich Dep. 20:7-21:11.  They suggested using ten hours of his time, for a total payment of $1,000.00.  Id.  On October 1, 2003, Mr. Thorner emailed Mr. Reutens to report that he had received a phone call from Irell & Manella regarding the case against Sony, and that he told them "it wouldn't be objectionable to send me a $1,000 retainer to own some of my time at the $100 per hour rate."

_____

[5]Immersion notes that Sony included similar provisions in its agreements with litigation consultants.  See, e.g., Heinrich Decl., Ex. J, ("To the extent anyone from Immersion, its attorneys or its agents, contact Dr. Ganapathy, he agrees not to have any discussions with them").

18

**United States District Court**
For the Northern District of California

Reutens Decl., Ex. A, at 1.  Mr. Reutens approved the $1,000 retainer and informed Mr. Thorner that the TouchWare Gaming product had been launched, noting that the launch "will be a good test of market acceptance for sound-to-vibe, and hopefully a revenue stream for you."  Id. at 1.

Mr. Thorner alleges that in October, 2003, he met Mr. Heinrich at a restaurant in Wall, New Jersey, where Mr. Heinrich subjected him to "extensive and specific questioning," and Mr. Thorner again explained his public use prior art "in great detail."  Thorner Decl. ¶ 20.  Mr. Thorner states that he brought prototypes of a TFCS main controller and a modified Sega Genesis dual motor handheld controller and offered to show them to Mr. Heinrich, who refused on the grounds that it would "make it easier for [Mr. Heinrich] to deny their existence."  Id. ¶ 20.  Instead, Mr. Heinrich made drawings in his notebook based on Mr. Thorner's descriptions.  Id.  Mr. Thorner was paid $1,000 for this meeting, the only compensation he received pursuant to the independent contractor agreement.

Acknowledging the meeting and the $1,000 payment, Mr. Heinrich disputes Mr. Thorner's account of their interaction.  Mr. Heinrich says that he discussed with Mr. Thorner the prior art on which Sony was relying for its invalidity case, including the seat embodiment described in Mr. Thorner's patents and the AT&T force feedback joystick.[6]  Heinrich Decl. ¶ 3.  Mr. Heinrich recalls Mr. Thorner explaining that an important difference between his technology and

---

[6]Mr. Thorner denies talking about the AT&T joystick with Mr. Heinrich.  Thorner Rebuttal Decl. ¶ 19.

the Sony DualShock controller was that his seat was "only an output

device."  _Id._  Mr. Heinrich states,

> At no point at this time or any other time did Mr. Thorner
> tell me that he had additional prior art other than his
> patents, and we did not discuss any alleged additional prior
> art of his other than his patents.  He did not tell me about
> any public use, demonstration, or disclosure of any alleged
> non-patent prior art.  He also did not tell me he had a prior
> art hand-held controller.  In fact, he distinguished his
> technology from a hand-held controller.

_Id._ He declares that substantial portions of Mr. Thorner's sworn

account of the meeting are untrue, including the statement that Mr.

Heinrich refused to look at prototypes but made drawings from

descriptions of Mr. Thorner's prior art.  _Id._ ¶ 4.  Mr. Heinrich

says that he drafted a handwritten memo of the meeting during his

flight back to California that day.  _Id._ ¶ 7.

Eight of Mr. Thorner's friends, family and business associates

declare under oath that he told them of discussions and agreements

with Immersion in 2003.[7]  According to these declarants, Mr.

Thorner looked forward to receiving "a lot of money" from Immersion

on the condition that he "hide" his prototypes and software, as

well as his past prior uses of the technology, from Sony and

Microsoft.  _E.g._, Gutleber Decl. ¶ 5.  Several report that Mr.

Thorner had initially been contacted by Sony and Microsoft, but

that those companies "had shown no great interest in an

arrangement."  _E.g._, Torres Decl. ¶ 4.  One friend reported that

Mr. Thorner claimed his agreements with Immersion were a "mechanism

---

[7]Immersion objects on grounds of hearsay and irrelevance to
the testimony of these witnesses.  The declarations are relevant
and admissible to show Mr. Thorner's prior consistent statements
and state of mind; the Court does not consider them as proof of the
matters asserted therein.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

for sharing in proceeds from the litigation revenue, because, although he had invented the technology, Immersion was better suited to serve as the plaintiff, and Immersion had agreed that they would pay him substantially in the future if they prevailed in their lawsuits."  Purrelli Decl. ¶ 6.  An employee of Mr. Thorner's recalls being told of the New Jersey meeting between Mr. Thorner and an Immersion attorney, who refused to look at Mr. Thorner's prototypes and documentation.  Brown Decl. ¶ 6.  Another remembers Mr. Thorner commenting on the irony of being paid to keep his technology secret.  Delay Decl. ¶ 4.  According to Lauren Clark, an ex-girlfriend with whom he remains in frequent contact, Mr. Thorner usually brings up the Sony-Immersion litigation "daily," because it "pretty much consumes him."  Clark Dep. 21:15-16.

C.   Discovery Conduct

During initial discovery, Sony produced to Immersion U.S. Patent No. 6,422,941 ('941 patent).  Heinrich Decl., Ex. 9, November 8, 2002 Letter from Matthew Bonini to Andrew Iancu.  The '941 names Mr. Thorner and Mr. Heilman as co-inventors and was dated July 23, 2002, so it was not prior art.

On June 16, 2003 Immersion's attorneys advised Sony that Mr. Thorner had "been retained" by Immersion, and asked Sony not to contact him further.  Lumish Decl., Ex. A, June 16, 2003 Letter from Richard Birnholz to Douglas E. Lumish and John P. Schnurer. The letter did not specify the capacity in which Immersion had retained Mr. Thorner.

Based on this letter, Mr. Lumish concluded that Sony was not permitted to interview or depose Mr. Thorner unless Sony made a

21

United States District Court

For the Northern District of California

showing that such discovery would fall within an exception under the Federal Rules of Civil Procedure, e.g. "extraordinary circumstances" under Rule 26(b)(4)(B). Lumish Decl. ¶ 5. At his deposition, Mr. Lumish clarified that he understood that Sony could have subpoenaed Mr. Thorner. Lumish Dep. 65:21-23.

In a subsequent letter, Mr. Birnholz explained that Immersion was not seeking to allow Mr. Thorner to have access to confidential Sony materials under the protective order, but that Immersion did intend to retain Mr. Thorner as a "consultant." Lumish Decl., Ex. B, June 23, 2003 Letter from Mr. Birnholz to Sonal Mehta.

In October, 2003, Immersion also retained Mr. Heilman as a litigation consultant at a rate of $100 per hour in connection with its lawsuit against Sony. See Heinrich Decl., Ex. 11, Oct. 1, 2003 Letter from Alan Heinrich to Paul Heilman (formalizing Mr. Heilman's retention as a consultant). The agreement provided that Mr. Heilman would not provide services related to the patents to any party other than Immersion. Mr. Heilman recalls only one resulting conversation with Alan Heinrich, counsel for Immersion, and says he received no money as a result of that agreement. Heilman Dep. 77-78; 73:4-7.

In discovery, Sony asked Immersion for all prior art concerning the patents-in-suit as well as all documents concerning the "functions and operations of any devices or technology developed" by Thorner. Gewirtz Decl., Ex. C, Sony's Requests for Production Nos. 54, 189. Immersion objected to the requests on various grounds, and did not provide Sony with any documents relating to Mr. Thorner's public use prior art, or list any such

22

United States District Court

For the Northern District of California

documents in its privilege log.  Immersion did not provide Sony
with its December 7, 1999 offer to acquire Mr. Thorner's '840
patent or its later license of his '722 patent.

Sony also asked Immersion for any "agreements or contracts
between Immersion or counsel for Immersion and any expert witness
or consultant hired by Immersion in connection with this action,"
and for all documents concerning efforts by Immersion to obtain
rights to Thorner's patents.  Id., Request Nos. 118, 185.  Again,
Immersion objected to the requests on various grounds, and did not
provide Sony with the offer or agreements it had made with Mr.
Thorner or list them in its privilege log.  At the hearing on this
motion, Morgan Chu, Immersion's trial counsel, explained that, when
faced with very broad requests for admissions, both parties would
at times respond with blanket objections without listing all
documents.  He later stated that Immersion's license agreement for
the '722 patent was irrelevant because it was directed toward
software not at issue at trial.

During the August 22, 2003 deposition of Immersion co-founder
Louis Rosenberg, Mr. Lumish asked whether Mr. Rosenberg was
"involved in any attempts by Immersion to purchase Mr. Thorner's
patents."  Lumish Decl. in Supp. of Sony's Opp'n to Immersion's
Mot. Summ. J, Ex. R, Rosenberg Dep. 119:25-120:1.  Mr. Rosenberg
answered that he was, but denied any recollection of when that
occurred or the dollar amount offered.  Id. 120:14-121:3.  In
September, 2003, Immersion supplemented its responses to Sony's
requests for admissions and, while reiterating its initial
objections, admitted that it "has had contacts with Craig Thorner

23

United States District Court

For the Northern District of California

concerning the possibility of obtaining rights to U.S. Patent Nos. 5,565,840 and 5,684,722 issued in part to Craig Thorner."  Sony's Supp. Ex., Immersion's Supp. Resp. to Sony's Second Set of Req. for Admis. at 4.  At the February, 2004 summary judgment hearing, Sony's trial counsel asked the Court to infer Immersion's wrongful intent in relation to Sony's inequitable conduct defense based on "additional evidence here you don't normally have, which is [Immersion's] attempt to go buy Thorner's patents, which shows, not only . . . knowledge but appreciation of importance."  February 27, 2004 Hearing Tr. 17:22-18:1.

Counsel for Sony decided not to seek further discovery from Mr. Thorner because he was then "a paid and potentially hostile consultant working for [Immersion], the likelihood of information being presented in a way that was unhelpful was amplified."  Lumish Dep. 65, 66:5-8.  According to Mr. Lumish, Sony anticipated that Immersion would oppose any effort to subpoena Mr. Thorner, and even if the effort were eventually successful, it "would have made the process more expensive and more difficult."  Lumish Dep. 146:22-147:10.  Mr. Lumish also concluded, "I didn't think there would be anything additional to get from him [through Rule 26], in light of the extensive discussions I had already had with him about the prior art."  Lumish Dep. 67:10-13.

Jennifer Liu, Sony's in-house counsel, explained to Sony executive Riley Russell, "Weil's plan at this point is to still use the Thorner patent in a summary judgment motion, wait until Thorner sticks his neck out in a declaration, and then chop it off.  We will see how well this strategy works."  Heinrich Decl., Ex. N,

24

August 23, 2003 Email from Jennifer Liu to Riley Russell.

    D.   Trial Assertions

    At trial, Mr. Chu, counsel for Immersion, presented closing
arguments which Sony believes could have been rebutted by Mr.
Thorner's public use prior art.  Mr. Chu asserted,

> Thorner didn't have complex combined sensations. . . .  All
> the motors in a set are either on or off identically.  Well,
> if they're all off, they're identically off.  But if they're
> all on, they're turned on to the same frequency and amplitude.
> Every one in this case, the five motors.  That's not what the
> patents involve here.

Gewirtz Decl., Ex. D, Trial Tr. 3725.  He later argued, "Did anyone
[before the inventors of Immersion's patents] have a way to combine
and control the use of two motors or a single motor on a special
control of pulsing to decouple?  And the answer's no."  Id. at
3733-34.  He also commented that, despite Mr. Thorner's patents,
there was "no evidence . . . of any sales or success or licensing
whatsoever in contrast to the Immersion patents."  Id. at 3736.

    E.   Thorner's Post-Trial Communications with Sony and
         Immersion

    In October, 2004, Immersion Vice President Mark Belinsky
contacted Mr. Thorner to discuss purchasing his patents rather than
continuing to pay small amounts of royalties.  Belinsky Decl. ¶ 3.
Mr. Belinsky suggested $50,000, and claims that Mr. Thorner
"indicated that number was in the right ballpark."  Belinsky Decl.
¶ 4.  Mr. Belinsky proposed a draft agreement by which Thorner
would sell his entire patent family to Immersion, but Immersion
would grant back an exclusive license to use them, for a total of
$50,000.  Belinsky Decl., Ex. C, December 6, 2004 Email from Mark
Belinsky to Craig Thorner, Purchase Agreement Proposal for your

25

United States District Court

For the Northern District of California

Review.   The offer was not accepted.

On January 13, 2005, Mr. Thorner sent an email to Mr. Belinsky offering to stay on as an exclusive consultant with Immersion in exchange for "a 'small' piece of the Sony revenue."  Belinsky Decl., Ex. D, January 13, 2005 Email from Craig Thorner to Mark Belinsky.  Mr. Thorner then demanded a $100,000 "signing bonus" for a ten-year consultancy agreement as well as $30,000 per quarter during the term of the agreement.  <u>Id.</u>  He stated his intention to pursue future litigation against Sony and Microsoft, and promised, "By reaching a deal with Immersion I'll agree to keep you off the defendants list with regard to my 2 applications cited by you regarding the IP in the case during my patent infringement litigation against Sony and Microsoft."  <u>Id.</u>  He noted that he had received nothing from Immersion "excluding the promise of future revenue," and said that the consideration he received up to then had been "irrelevant and hasn't helped me one whit but for the fact that 2006 might see substantial VibeTonz revenue."  Mr. Belinsky rejected the offer, stating that Immersion was "happy to continue working under the existing arrangements."  Belinsky Decl., Ex. D, January 20, 2005 Email from Mark Belinsky to Craig Thorner.

According to Mr. Belinsky, Mr. Thorner called that day and told him that he had prior art that had been "held secret in his basement up to now."  Belinsky Decl. ¶ 8.  In response, Mr. Belinsky asked to see the purported prior art so that Immersion could decide whether to make additional disclosures to the Patent Office, and stated, "Immersion would not under any circumstances pay you or anyone else to keep potential prior art hidden."

United States District Court

For the Northern District of California

Belinsky Decl., Ex. E, January 27, 2005 Email from Mark Belinsky to Craig Thorner.  Later, Mr. Thorner again threatened to pursue litigation against Immersion, saying, "I made a mistake in not insisting on some small percentage of your revenues from said litigation [against Sony and Microsoft] and this is a mistake that I intend to correct by enforcing my own IP."  Belinsky Decl., Ex. E, January 27, 2005 Email from Craig Thorner to Mark Belinsky.  In an April 15, 2005 email to Mr. Belinsky and Mr. Viegas, Mr. Thorner again threatened to enforce patent rights against Immersion, to cooperate "with any and all 3rd parties to produce results that are beneficial to my interests, including but not limited to cooperation with Sony for the issues currently under appeal," and to publicize Immersion's alleged victimization of him.  Belinsky Decl., Ex. F.

Mr. Thorner's consulting contract with Immersion expired on April 18, 2005, and he contacted Sony soon thereafter.  He informed it that he was "open to any and all suggestions as to how we might accomplish some sort of compensation for utilizing my technology, my patents, my disclosures, my testimony, my cooperation, my demonstrations, et cetera."  Thorner Dep. 137:23-138:4.  In exchange, he asked for "Money, some form of money . . . A thank you note wasn't going to do it."[8]  Id. 138:8-11.  According to Mr. Thorner, Immersion had by that point offered him $250,000 to extend

_____

[8]Mr. Thorner personally and his company had suffered substantial monetary losses over the past eleven years.  Thorner Dep. 401:12-15.  In addition, on August 15, 2005, the New Jersey Superior Court issued a warrant for Mr. Thorner's arrest in connection with failure to pay a August 26, 2004 civil judgment against him.  Heinrich Decl., Ex. P.

**United States District Court**

For the Northern District of California

his consulting agreement.   Id. 138:13-15.   Immersion denies making such an offer.

On May 26, 2005, Mr. Thorner entered into a "license agreement" with Electro Source, a co-defendant with Sony in a related action brought by Immersion.   Sony has a joint defense agreement with Electro Source.   Mr. Thorner provided Electro Source with a license to sell products that infringed the Thorner patents, but excluded from the license products "in the field of vibro-tactile seats and vests."   Heinrich Decl., Ex. S, Electro Source License Agreement.   The '818 and '840 Thorner patents are directed primarily to vibrating seats and vests.   Electro Source agreed to pay Mr. Thorner $150,000 as an advance royalty under the license. Mr. Thorner also agreed with Electro Source that, "at Sony's election," he would

> enter into a license agreement to grant a license to Sony with respect of the Patents, upon the same terms and conditions as set forth herein and in the form of the [Electro Source License Agreement] attached hereto, including without limitation, royalty amounts and set-off rights, provided that Sony shall not be required to pay the Advance Royalty.

Kennedy Decl., Ex. 1, May 26, 2005 Deal Point Memorandum Re: Vibro-tactile Technology Patents.

Sony maintains that it and Electro Source entered into the arrangement described in the Deal Point Memorandum because Mr. Thorner had accused them of infringing his patents.   Larry Russ, counsel for Electro Source, says that he received $150,000 from Sony which he used to pay the advance royalty to Mr. Thorner, pursuant to the Electro Source license agreement.   Heinrich Decl., Ex. O, Russ Dep. 30:16-24.   According to Sony's internal wire

28

**United States District Court**
For the Northern District of California

transfer request, however, the purpose of the $150,000 given to Mr. Russ was to secure an "option to purchase Thorner patents for Immersion case."  Heinrich Decl., Ex. T, May 24, 2005 SCEA Wire Transfer Request (emphasis added).

Mr. Russ explained to Mr. Thorner that $150,000 was the most he could get as an advance, and that the deal "still depends upon a couple of matters," specifically,

> 1) Sony is preparing a Declaration for you to sign.  If the declaration is not acceptable to you and cannot be worked out, we have a problem.
> 2) We need to know whether you still have the Sega Controller.
> 3) We need to know who you showed your proto-type to.  Not helpful if just to your girlfriend.

Heinrich Decl., Ex. A, May 9, 2005 Email from Larry C. Russ to Craig Thorner.  Mr. Thorner responded that he would accept the $150,000, as long as he got help "putting pressure" on Immersion to pay revenues owed him, and with other legal matters.  Id., May 9, 2005 Email from Craig Thorner to Larry C. Russ.  Mr. Thorner assured the Electro Source attorney, "I am sure the Sony declaration will suffice, and it should be as strongly worded as possible."  Id.  He also assured Mr. Russ that he had the modified Sega controller and that he expected Mr. Russ would be "pleased with the witness list."  Id.  Mr. Thorner testified that all of the discussions leading up to the first agreement he signed with Electro Source "were designed and carried out specifically as a process of negotiation to result in some form of compensation."  Thorner Dep. 142:22-25.  Mr. Thorner understood that he had to produce what he believed was corroborating evidence before he would be paid $150,000.  Id. 204:23-205:3.  Nevertheless, Mr. Thorner

29

**United States District Court**

For the Northern District of California

testified that he did not believe that the $150,000 came from Sony, and that he had been told "numerous times" that Sony would pay nothing for his cooperation. Id. 186:4-187:16.

According to Mr. Russ, he, Mr. Russell and Mr. Thorner all participated in a conference call on May 11, 2005, for the purpose of discussing the underlying content of Mr. Thorner's declaration as well as his due diligence in searching for evidence of his public use prior art. Russ Dep. 162:7-163:12. Mr. Russell prepared a rough draft of the declaration for Mr. Thorner. Heinrich Decl., Ex. Q, Russell Dep. 206:3-4. Nevertheless, Mr. Thorner insists, "The specific sentence syntax and presentation of this entire document is my sole testimony." Thorner Dep. 160:21:23. Several drafts were completed before Mr. Thorner was paid, although he continued to work on the declaration after receiving payment. Thorner Dep. 205:15-24. Mr. Gewirtz, Sony's new outside counsel, testified that he personally handed Mr. Thorner the $150,000 check from Electro Source, while Mr. Thorner was in his office in connection with Sony's Rule 60(b) motion. Gewirtz Dep. 71:2-16.

Mr. Russ and Mr. Thorner testified that they did not discuss the "content" of the declaration, Thorner Dep. 167:16-18, Russ Dep. 51:19-22, but Mr. Russ says that he did discuss the declaration's "subject matter" with Mr. Thorner. Russ. Dep. 134:13-25. Mr. Russ was also responsible for asking Mr. Thorner to search his records, hard drives and emails for corroborating evidence; Mr. Russ refused to say, on grounds of attorney-client privilege, whether this effort was related to Sony's Rule 60(b) motion. Russ Dep. 134:24-

30

136:3.

Mr. Russell denies that the $150,000 payment from Sony to Electro Source was a reimbursement for Electro Source's $150,000 payment to Mr. Thorner.  Kennedy Decl., Ex. 5, Russell Dep. 50:1-16.  Mr. Russell denies that Mr. Thorner knew that Sony had purchased an option for licensing the Thorner patents from Electro Source.  Id. 10-12.

On May 16, 2005, Mr. Thorner emailed Mr. Russ to say that he needed to take a break in order to file an unrelated patent application with the PTO, for which he would otherwise have to pay a $510 late fee.  Ex. 17, May 16, 2005 Emails.  At first Mr. Russ, copying Mr. Russell, emailed to say that delay would be acceptable. When Mr. Thorner informed him of the potential length of the delay, Mr. Russ warned, "It is your call, but the longer you wait, the greater the risk of this thing falling apart.  Your declaration only has value to us if Sony can use it to request a new trial." Id.  Ultimately, Mr. Russ paid Mr. Thorner's late fee.  Sony then paid the Russ law firm approximately $500 in order to reimburse Electro Source for money it had advanced to Mr. Thorner for the late filing fee.  Russell Dep. 64:6-13.  This payment was not pursuant to Thorner's license agreement with Electro Source; when asked if it was a gift, Mr. Russ replied, "You can call it anything you want."  Russ Dep. 109:18-22.

On June 1, 2005, Mr. Thorner sent Immersion an email asking whether "the $250K offer to maintain my unilateral cooperation with Immersion" was "still on the table."  Belinsky Decl., Ex. H, June 1, 2005 Email from Craig Thorner to Mark Belinsky.  Mr. Belinsky

31

responded, "I don't have my notes handy, but I don't recall an offer as you describe below." <u>Id.</u>, June 3, 2005 Email from Mark Belinsky to Craig Thorner.

LEGAL STANDARD

Rule 60(b) enumerates the grounds upon which a motion for relief from an order or judgment may be made.  It specifies the following:

1) mistake, inadvertence, surprise or excusable neglect;

2) newly discovered evidence which by due diligence could not have been discovered before the court's decision;

3) fraud by the adverse party;

4) the judgment is void;

5) the judgment has been satisfied; or

6) any other reason justifying relief.

Here, Sony moves for relief from final judgment on the grounds of newly discovered evidence and fraud.

Relief from final judgment on the basis of newly discovered evidence under Rule 60(b)(2) "is warranted if (1) the moving party can show the evidence relied on in fact constitutes 'newly discovered evidence' within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover this evidence; and (3) the newly discovered evidence must be of 'such magnitude that production of it earlier would have been likely to change the disposition of the case.'" <u>Feature Realty, Inc., v. City of Spokane</u>, 331 F.3d 1082, 1093 (9th Cir. 2003) (quoting <u>Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.</u>, 833 F.2d 208, 211 (9th Cir. 1987)).

In order to prevail on a motion for relief from final judgment under Rule 60(b)(3), a movant must

> (1) prove through clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct.
> (2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense.

Jones v. Aero/Chemical Corp., 921 F.2d 875, 878-879 (9th Cir. 1990) (quoting Bunch v. United States, 680 F.2d 1271, 1283 (9th Cir. 1982)).  "Failure to disclose or produce materials requested in discovery can constitute 'misconduct'" under Rule 60(b)(3), and misconduct "does not demand proof of nefarious intent or purpose as a prerequisite to redress."  Id. at 879 (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).  When "the case involves the withholding of information called for by discovery, the party need not establish that the result in the case would be altered."  Id. (quoting Bunch, 680 F.2d at 1283).  Rule 60(b)(3) also requires that the fraud "not be discoverable by due diligence before or during the proceeding."  Pac. & Arctic Ry. and Navigation Co. v. United Transp. Union, 952 F.2d 1144, 1148 (9th Cir. 1991).

DISCUSSION

I.  Newly Discovered Evidence

Even if Sony cannot show that Immersion committed fraud or other misconduct, Sony may be entitled to relief from final judgment if it can show that it exercised due diligence to discover the new evidence, and that the new evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1     Two categories of information provided by Mr. Thorner to Sony

2 in April, 2005 could constitute newly discovered evidence under

3 Rule 60(b)(2):  (1) evidence of Mr. Thorner's public use prior art,

4 including the seat pad and controller prototypes, the IntelliVIBE

5 programs and Mr. Thorner and others' oral testimony; and

6 (2) Immersion's 1999 offer to purchase the '840 patent, its April,

7 2003 consultancy agreement with Mr. Thorner and its April, 2003

8 acquisition of a license for Mr. Thorner's '722 patent in exchange

9 for the Moriyasu patent.  Immersion argues that Sony could have

10 discovered this information had it sought discovery of Mr. Thorner

11 or filed a motion to compel, and thus Sony failed to exercise due

12 diligence.

13     A.   Public Use Prior Art

14     Based on Mr. Thorner's initial discussion with Mr. Lumish,

15 Sony knew that Mr. Thorner thought he had valuable information

16 relating to the lawsuit and that he had an extant prototype of his

17 vibrating seat in his garage.  Mr. Lumish says that, based on Mr.

18 Thorner's statements to him, he reasonably concluded that the

19 prototype was coextensive with the patents.

20     This belief, even if reasonable due to Mr. Thorner's

21 misleading, incomplete or false statements, is not sufficient to

22 support Sony's claim that it exercised due diligence with respect

23 to Mr. Thorner.  Sony asserted that the Thorner patents themselves

24 invalidated Immersion's patents-in-suit.  The scope and capability

25 the inventions disclosed in the Thorner patents were hotly

26 contested at trial.  As Sony internal emails demonstrate, Sony made

27 a deliberate, strategic decision not to seek additional discovery

28

United States District Court

For the Northern District of California

from Mr. Thorner concerning his inventions.  Sony was concerned that, because Mr. Thorner had been retained as an expert by Immersion, his testimony would be presented in an unfavorable way. Even this rationale fails to explain why Sony did not seek to obtain the prototype, which it admittedly knew existed.  Had Sony conducted fact discovery into the prototype and its past use, it would certainly have learned of its demonstration, which would have led to witnesses such as Mr. Romero, Mr. Freeman and Mr. Marsala, and thus the existence of additional prior art accessories.  If the seat pad does produce the claimed complex vibrations, as witnesses to its demonstration now testify, then Sony forwent its opportunity to discover that information and present it to the jury.

Sony blames Immersion for its lack of due diligence, claiming that Immersion "misled" Sony into believing that Mr. Thorner had been retained as an expert witness.  Yet Immersion never told Sony that Mr. Thorner was being retained as an expert, and just over a week after telling Sony not to contact him, Immersion described Mr. Thorner to Sony as merely a "consultant."  Sony claims that it could not have known that Mr. Thorner was "an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit," and thus capable of being deposed as a fact witness.  Fed. R. Civ. P. 26, Advisory Committee Notes.  Yet Sony knew well that Mr. Thorner was not simply an expert for hire, but also an "actor or viewer" by virtue of his invention of the technology which Sony would argue at trial invalidated Immersion's patents, and because Sony knew that Mr. Thorner had created a prototype of that allegedly invalidating technology.  Sony's level

35

United States District Court

For the Northern District of California

of knowledge about Mr. Thorner's past activities and experience is comparable to that in cases where courts have permitted deposition of non-testifying experts as fact witnesses, without a showing of extraordinary circumstances under Rule 26(b)(4).  See Norfin, Inc., v. Int'l Bus. Mach. Corp., 74 F.R.D. 531, 533-34 (D. Colo. 1977) (allowing deposition of expert without showing of extraordinary circumstances regarding his prior experience as actor or viewer of prior art technology); Atari Corp. v. Sega, 161 F.R.D. 417, 421-22 (N.D. Cal. 1994) (allowing deposition of expert without showing of extraordinary circumstances regarding his invention prior to his employment as expert).  The Court concludes that Sony could have discovered the additional public use prior art if it had exercised due diligence by deposing Mr. Thorner and seeking discovery of his prototype, but reasonably chose not to do so for strategic reasons.

B.  Offer and Agreements Between Immersion and Thorner

With respect to the Immersion's 1999 offer to Mr. Thorner as well as the subsequent agreements between them, Sony did propound requests to which those documents would have been responsive. Immersion says it withheld them based on its asserted blanket grounds of privilege, including relevance and work product.

With respect to the consulting agreement between Immersion and Mr. Thorner, Sony has not shown that it exercised due diligence. Sony was directly informed of Mr. Thorner's retention by Immersion and should have known that a written document memorializing this agreement likely existed, yet Sony failed to challenge Immersion's claims of privilege on this ground.  Moreover, Sony did not produce its own agreements with expert witnesses in response to

36

United States District Court

For the Northern District of California

1   corresponding Immersion requests.  In any event, this agreement

2   would have provided little probative information.

3       Immersion's failure to produce either the 1999 offer to

4   purchase the '840 patent or the 2003 license agreement for the '722

5   patent is more troubling.  Immersion does not explain how these

6   documents could have been withheld properly pursuant to the

7   privileges it asserted, such as attorney work product.  In <u>Canady</u>

8   <u>v. Erbe Elektromedizin GmbH</u>, 99 F. Supp. 2d 37 (D. D.C. 2000), the

9   defendants were served a request for production of certain patent

10  prosecution histories.  They responded by objecting on grounds of

11  relevance and attorney-client privilege, and then stated that all

12  responsive documents had been produced "subject to the objections."

13  99 F. Supp. 2d at 44.  The defendants produced a copy of a patent

14  application, but not the PTO's response or their later amendment,

15  which the court subsequently found constituted material, non-

16  cumulative evidence.  The defendant attempted to avoid a Rule

17  60(b)(2) motion by arguing that the plaintiff failed to exercise

18  due diligence by failing to request a privilege log.  The court

19  rejected this defense, finding that the stated objections were

20  unsupported by the record and that the defendant's excuse that it

21  had notified the opposing party of its objections was disingenuous,

22  reasoning that this notice indicated "only that [the defendant]

23  might be withholding documents which fell under its relevance or

24  privilege objections to request 32, not that it might be

25  withholding responsive documents which did not qualify under these

26  objections."  99 F. Supp. 2d at 48.

27      In this case, there was a privilege log, but the 1999 offer

28                                    37

United States District Court

For the Northern District of California

and 2003 license were not listed.   The license agreement in particular is relevant to Immersion's assertions at trial that Mr. Thorner and other prior art inventors were commercially unsuccessful.   Immersion claims that the 2003 agreement had "nothing to do with prior art" because Sony did not rely on the '722 patent for its invalidity case at trial.   Pl.'s Opp. at 24. This statement, like the defendant's in <u>Canady</u>, is disingenuous. During the summary judgment briefing, Sony did rely on the '722 patent, which Sony argued disclosed the "pulsing to decouple" element of Immersion's patents.   Furthermore, the '722 patent was incorporated by reference into the '840 patent, which Sony did rely upon at trial.

Nevertheless, Sony clearly knew that Immersion had made some sort of offer to Mr. Thorner, as shown by both Mr. Lumish's questioning of Mr. Rosenberg and Immersion's subsequent admissions. Although those admissions were less than fully candid, had Sony wished to use at trial Immersion's commercial interest in Mr. Thorner's patents, it could have pursued the issue further with a motion to compel, or used the information it did have to show that Immersion had considered purchasing Mr. Thorner's patents.   This information, if presented to the jury, may have had some marginal purpose in rebutting Mr. Chu's blanket statement that Mr. Thorner had had no success in licensing his patents.   Accordingly, the Court finds that Sony did not exercise due diligence in seeking information about Immersion's licensing or attempts to license the Thorner patents.

Furthermore, Sony has not explained how this information would

38

**United States District Court**
For the Northern District of California

have made the difference in enabling it to meet its burden of proving by "clear and convincing evidence" that the patents-in-suit are invalid.  There is no evidence that Immersion itself enjoyed any commercial success due to its license of the '722 patent.  In fact, the evidence indicates that Mr. Thorner realized little profit from his portion of the licensing agreement.  Thus, the offer and agreement's probative value with respect to the issue of commercial success is slight.  Therefore, the Court denies Sony's motion under Rule 60(b)(2) with respect to newly discovered evidence.

II.  Fraud, Misrepresentation or Other Misconduct

     A.  Thorner's Public Use Prior Art

     In order to show that it is entitled to relief from final judgment under Rule 60(b)(3), Sony must first show by clear and convincing evidence that Immersion engaged in fraud or other misconduct.

     Sony's allegations that Immersion engaged in fraud by conspiring to hide evidence of Mr. Thorner's public use prior art rest entirely on Mr. Thorner's testimony.  Immersion does not deny that his allegations, if true, would amount to clear and convincing evidence of misconduct by Immersion.  Instead, Immersion contends that Mr. Thorner has lied about their interactions with each other, and all of the Immersion employees and attorneys involved deny knowledge of, much less a conspiracy to suppress, public use prior art.

     Having considered all of the evidence, the Court concludes that Mr. Thorner is too unreliable a witness to enable Sony to meet

its burden to prove by clear and convincing evidence that Immersion
engaged in misconduct.  To the contrary, strong evidence, including
internal Sony documents and Mr. Russ and Mr. Thorner's own
testimony, shows that Mr. Thorner reasonably understood his
satisfactory testimony against Immersion to be quid pro quo for his
receipt of $150,000 payment pursuant to the purported Electro
Source licensing contract.  Internal Sony documents describing the
$150,000 option payment to Electro Source as "for Immersion case"
bely Sony's claim that it purchased the option because Mr. Thorner
threatened to sue Sony for infringement.  Mr. Thorner came to Sony
with the intent of offering testimony and cooperation on the
condition that he receive "some form of money."  His lucrative
Electro Source licensing contract fits that criterion.  The fact
that the license agreement excluded from its purview products in
the field of vibro-tactile seats and vests, despite the fact that
Mr. Thorner's patents are directed toward such technology, further
suggests that the license agreement itself lacks a legitimate
business purpose.  Mr. Thorner's email exchange with the Electro
Source attorney shows the close connection between his testimony
and contract:  "If the declaration [drafted by Sony attorney Riley
Russell] is not acceptable to you and cannot be worked out, we have
a problem."  Mr. Thorner was in need of money.  He understood that
Electro Source and Sony were cooperating in their disputes with
Immersion.  He understood the importance of "strong" statements and
the right witnesses (e.g., "not just your girlfriend").  Despite
Sony and Electrosource's efforts not to effect a direct exchange,
when Mr. Thorner found himself needing to pay a late filing fee due

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

to his work for Sony, Electrosource paid the bill and Sony promptly reimbursed it.   In this context, the fact that Sony also told him "numerous times" that it would not pay for testimony appears to be mere window dressing.

Even if he had not been paid, Mr. Thorner's credibility would be weak.   According to his own account, he conspired with Immersion to hide evidence in exchange for a favorable business deal that he hoped would bring him significant future revenue, after trying but failing to obtain a similar deal with Sony.   Mr. Lumish says he questioned Mr. Thorner "extensively" about his prior art, yet came away from their interaction unaware of any public demonstrations of that prior art and convinced that the prototypes in Mr. Thorner's garage were no more extensive than the patents.   This suggests that Mr. Thorner lied to or misled Mr. Lumish even before he had entered into an agreement with Immersion.

Mr. Thorner can produce no contemporaneous documents supporting his testimony that he and Immersion conspired to keep public use prior art secret from Sony.   To the contrary, his July, 2003 email to Immersion contains no hint of the alleged conspiracy, and is inconsistent with his reports to friends and family that he would be entitled to share in the fruits of Immersion's recovery. In fact, Mr. Thorner's own communications to Immersion show that he became frustrated precisely because he gained nothing from Immersion's success at trial.   Although the testimony of his family, friends and colleagues does show some prior consistent statements of Mr. Thorner, their testimony is not in itself evidence of Immersion's knowledge of Mr. Thorner's public use prior

41

**United States District Court**

For the Northern District of California

art.  Instead, the declarants' testimony could support alternative scenarios that are not evidence of misconduct of Immersion; for instance, that Mr. Thorner wished his friends and family to believe he had a lucrative deal.  The declarants' testimony does not bolster Mr. Thorner's credibility sufficiently to meet the clear and convincing evidence standard.

Mr. Thorner's repeated revision of his own testimony is also troubling.  Mr. Thorner may have made honest mistakes when he claimed the invention demonstrated in September, 1994 had eight zones; when he removed the header and declared a computer program written in 1996 to be a 1994 prior art product; and when he subtly revised his testimony regarding public use of the modified Sega controller after none of the other witnesses could recall him actually demonstrating it.  Still, this need for revision of Mr. Thorner's testimony suggests that his initial testimony was neither careful nor conscientious, further undermining his reliability.

It is true that some circumstantial evidence supports some portions of Mr. Thorner's story.  For instance, Mr. Heinrich's account of his New Jersey meeting with Mr. Thorner, in which he discussed significant prior art technology, yet took no contemporaneous notes, is not entirely believable.  Nevertheless, Sony has identified no circumstantial evidence strong enough to surmount the clear and convincing standard hurdle.  Instead, the record before the Court involves significant factual disputes between Mr. Thorner and Immersion's representatives, which turn primarily on the credibility of the parties involved.  For the reasons described above, the Court finds that Mr. Thorner's account

42

**United States District Court**
For the Northern District of California

of Immersion's misconduct does not and cannot rise to the level of clear and convincing evidence.  Accordingly, the Court denies Sony's motion for relief from final judgment pursuant to Rule 60(b)(3) on the basis of Immersion's alleged suppression of Mr. Thorner's public use prior art.

B.   Offer and Agreements Between Immersion and Thorner

Finally, the parties dispute whether Immersion's failure to produce its offer to and agreements with Mr. Thorner constitutes misconduct for purposes of Rule 60(b)(3).

In Casey v. Albertson's Inc., 362 F.3d 1254 (9th Cir. 2004), the Ninth Circuit found that a simple failure to respond to a request for production does not constitute fraud.  In that case, the court reasoned,

> It is significant to note that this is not a case in which it is alleged that Albertson's possessed Smith's employment records but falsely denied having them, or the like.  Casey simply argues that Albertson's failed to respond to a discovery request made two and a half weeks before the close of discovery.  This is a run-of-the-mill discovery problem for which the rules provide remedies, had they been sought (as Casey herself learned the hard way when she failed to respond to Albertson's requests for admissions).  Albertson's discovery recalcitrance does not constitute fraud.  Moreover, Casey failed to file a motion to compel production of Smith's employment records.

362 F.3d at 1260-61.  In contrast, the court in Canady found (in the alternative, after granting a motion for relief from final judgment based on new evidence) that the defendant's failure to produce a full patent history constituted misconduct.  It noted that the withheld documents were also responsive to another request for all documents relating to the inventor, to which the defendant replied, "All documents responsive to this request have been

43

**United States District Court**
For the Northern District of California

produced by Plaintiffs."  99 F. Supp. 2d at 49.  The court found that this inaccurate statement formed a basis for relief from final judgment on grounds of misconduct.

Here, in contrast to <u>Canady</u>, Sony has not identified a particular false statement by Immersion, but instead relies on Immersion's omission of the offer and agreements as evidence of misconduct.  The Court is troubled by these omissions, which appear to violate Immersion's duties of disclosure under Federal Rule of Civil Procedure 26.  In the context of this case, however, such discovery violations do not rise to the level of misconduct justifying relief from final judgment.  The Court has already noted with disapproval the aggressive discovery conduct of both parties. <u>See</u> JMOL Order at 24.  As explained above, Sony cannot claim that it was misled by Immersion's failure to produce its consultancy agreement with Mr. Thorner because it knew of the arrangement, and Sony did not produce copies of similar agreements it had made.  In light of Sony's awareness of Immersion's offer to purchase Mr. Thorner's patents, Sony could have moved to compel production of relevant documentation if it felt that such information was important to its defense.  Sony apparently decided that Immersion's purported commercial interest in the Thorner patents was not sufficiently relevant or important to present to the jury, even though it could have been used to rebut a very small portion of Mr. Chu's closing argument.  Sony has not explained why Immersion's license of the '722 patent would, in contrast, be part of a full and fair presentation of its defense.

This motion has raised concerns about both parties' litigation

44

conduct.   However, the Court finds that Sony has not presented clear and convincing evidence of misconduct by Immersion that would warrant a new trial.

CONCLUSION

For the foregoing reasons, the Court DENIES Sony's motion for relief from final judgment (Docket No. 1761).


IT IS SO ORDERED.


Dated: 3/8/06

_____
CLAUDIA WILKEN
United States District Judge